Next case called for arguing this web versus Union Pacific Railroad Company Council. Whenever you're ready, you may proceed. Thank you. May it please the court and Council. I'm Chris Petrie, and that's my partner, Eric Carlson, and we represent the appellant Guy Webb. And this is the second time we've appeared before the court in this train collision case. This is an appeal from a jury verdict and the trial court's order denying our post trial motions. The verdict was entirely in favor of the defendant, who I may sometimes call Union Pacific or U. P. And it was in a pure comparative fault case, which means that it assigned 0% of the blame of the collision to the defendant and 100% of the blame to web our client. And as you know, that verdict is in stark contrast to the previous verdict in this matter, which found the defendant Union Pacific 50% fault and awarded Webb $2,500,000, a verdict which was reversed by this court for errors in the admission of evidence. I submit to you that just as you held that the first trial, the first trial involved prejudicial air that necessitated the reversal of the verdict for Guy Webb. This trial contained prejudicial air that necessitates necessitates the reversal of the verdict in favor of Union Pacific. Although I'll cover it later in more detail, the crux of this appeal is that Union Pacific was permitted to tell the jury directly and indirectly, including through eliciting testimony from our own expert witness that there was no legal obligation under the law to take the safety precautions at issue, which we were maintaining should have been taken, such as blowing whistle prior to crossing, cutting the vegetation or adjusting the slope of the crossing. This was highly prejudicial evidence and it amounted to the defendant taking a matter of fact that was for the jury to decide and presenting it as a conclusion of law. Now I'd like to talk just a little bit about the background of the case, but I won't belabor the facts and the evidence a lot because this is the second time you've had a chance to review the case and because you also have pictures and a video of the accident in the record. I just want to highlight a few facts about the crossing and the train. The sight lines of this crossing were essentially blind from both the car and the train engineer's perspective. The driver only had 128 feet of unobstructed view down the tracks from 15 feet of the rail. Compared to standards for public crossings, this was 91.1% less sight for the driver to have down the rail. The crossing was also unusually hazardous due to its grade. Generally, crossings are flat. However, in this case, there was a 40-inch rise in the crossing in the 30 feet leading up to the rail. Again, comparing this to standards for public crossings, this was over 1,000% more steep of a slope than is acceptable at public crossings. And if it could get public crossings, yes. Third, the crossing was composed of gravel, which made it difficult to start and stop. And you can see this in the video. The guy and the driver were trying to drive the car off the crossing. You can see the wheels spinning in the gravel. Did they determine if he was spinning forward or backwards? I think there was testimony both ways on that. And it's further disputed that the train engineer did not blow the whistle until 3.5 or 4 seconds after Webb's vehicle was in view from the windshield of the train. And he certainly did not blow it as a kind of slope. And finally, and perhaps most importantly, unlike the first trial, we actually discovered more favorable evidence for us in this trial, and those were UP's internal rules. I will admit to you that those rules were retired as of the date of the accident. However, one of them was in effect three years before the accident, and one of them was in effect approximately 30 days before the accident. The one that was revoked in 2004, three years before the accident, required UP to cut the vegetation at all crossings, public or private, back to 300 feet from the crossing. The one that was revoked in July 2007, which is about 30 days before the accident, required UP to blow its whistle at a private crossing if there were motor vehicles near the crossing or if there was an obstruction. Let me get this straight. These are things that do not apply or do apply? These are UP's own rules. UP's own rules. Union Pacific's own rules that were retired. They revoked them prior to the day of the accident. But of course, this begs the question, how could the crossing be safe one day and unsafe the next day, non-violative of UP's rules one day and violative of UP's rules another day? How could that be the case? And of course, these two internal rules, which were retired, they were not the case. The vegetation was not cut back to 300 feet and the train engineer did not blow the whistle until 3.8 seconds before the impact. Webb suffered massive injuries. Was he the driver or the passenger? He was the passenger. Webb suffered massive injuries, severe brain damage. He functions as a 12 year old and he will need care for the rest of his life. Despite the evidence of the danger of the crossing and the way the train was operated, we returned a verdict of a 100% fault for Webb and 0% fault for UP in a comparative fault case. This case was tried under Missouri law, which uses pure comparative fault, which means that if UP was 1% at fault for the accident, there should be a verdict in favor of the plan for 1% of damages. Was there any specific, or did it make any special findings or questions? No, there was no special one arrived for. No. Given the above evidence, I submit to you that that jury verdict was air and that jury verdict was air and became that way because of errors in the admission of evidence, which brings me to the first point on appeal. The trial court used its discretion by allowing an offendant to admit evidence and argue that the jury, that it had no duty, that UP had no legal obligation to take the safety measures at the crossing. Counsel, may I ask you a agree that the previous decision of this court in its order after the first trial as part of the law of the case? I do. Okay. The Union Pacific was permitted to tell the jury directly and indirectly that there were no legal obligation to take the safety precautions at issue. And most egregiously, I'm going to read a question from the record. This is the most egregious example. They're questioning our expert witness and they asked him this federal government. And you've looked at the law of the state of Missouri. And as far as this train crew, there was no obligation under those laws to blow the whistle in a private crossing. That's what the record 85 86. The witness testifies. I'm not I'm not aware of such a law. Obviously, the witnesses and an expert in common law duties versus statutory duties and things like that. And he should never be asked that question. And this means that the defendant had the plaintiff's expert testify that there was no law that required the very actions the plaintiff maintained the defendant had to take not to be negligent. Was there an objection made at that? Yes, there was an objection made to this question. Okay. This is obviously prejudicial. In fact, what's left for the jury to decide when they hear the plaintiff's own experts say there was no legal obligation under the law to take the safety measure. It that's that question completely vitiated common law duty, which, of course, was the duty of the case. That question and answer was prejudicial enough. But the fact that the court heard the question and and overrule the objection gave the dialogue the imprimatur of the court and there's case law that says when the court ordains something like that, it increases the prejudice. And that's the major case cited in my brief. And it wasn't just this one question, although that is clearly the most egregious example and the most prejudicial. They made comments and arguments that they had no duty to adjust the grade of the crossing or cut the vegetation. They enlisted testimony regarding Missouri statutes, which were inapplicable to stress their legal conclusions that there was no obligation to take those safety measures. We didn't put those Missouri statutes into evidence. They were the ones talking about inapplicable Missouri statutes so that they could tell the jury there's no legal duty to do these things. They also argued in closing that they had complied with all of Missouri's rules. And of course, common law is one of Missouri's rules. In short, they told the jury directly and indirectly their legal conclusion about the ultimate facts that the jury was supposed to be deciding. This is highly prejudicial. Now, in their response brief, the U.P. says we weighed this argument, that their tactics were proper, that we rehabilitated any prejudice, or that we invited the air. And none of them have merit. As far as waiver goes, in our post-trial motion, I quoted a paragraph from our brief. I'll just read a snippet of it. Throughout the trial of this matter, Union Pacific repeatedly offered and interjected into the proceedings that no federal or state statute or regulation required it to cut vegetation back and blow its whistle at this private crossing. And then I'll skip forward. Presumably the reason for this evidence was to argue or establish that it had no duty or obligation to blow its whistle or trim the vegetation at this crossing. So in our post-trial motion, we put this argument forth to the trial court. They say that you haven't done it just exactly how you've done it in your appellate brief. You haven't done it as specifically as you've done it in your appellate brief. But that's not the standard for waiver. All we have to do is put the trial court on notice of the argument. And we did that. And that's the Swagger v. Puri case cited in my brief. I was a little I was a little confused about the somebody who owns water. The center of the railroad is something and then yet the approach to the crossing. I think what they were talking about something in a brief. I don't know which. Sure. Sure. I think we're talking about the right way. The land around the tracks farther away from the tracks is owned. Is that an easement or are they owned? No, no, they have an easement. Union Pacific has an easement. Over the old. Yes. Okay. Yes. And the land is owned privately. And of course an easement owner has a reasonable duty to people who are going. But then something about that except for the center of the truck. I didn't quite understand what their is that just an easement also then the center of the rail between the rails. I don't know. There was something in there. The whole process including the rails is an easement and that they're under a duty to make it reasonably safe. And we pointed to Missouri law on that in our brief. Don't they own the area between the rails and the rails and they have an easement on the rest of it. So basically they can maintain. That's what I was trying to say. They have an easement coming off the rails and then they own the rails. Right. Yes. I have an answer. I apologize. Ground between the rails also. I apologize if I was not clear. No. As for this waiver argument that they're trying to make, I would also point out that we objected to the most egregious examples of what they were doing. We use good trial strategy. We objected to the egregious examples of what they were doing. We didn't object to every single tactic, but we certainly preserve our argument in the Court of Appeals with our objection and our post-trial motions. The next point that you can make is that really this was proper. It was okay to do this under the court's previous ruling as you asked about your memory. As I read the court's previous opinion, what it was saying was if we admitted standards or regulations that were applied only to public crossings, they could demonstrate that the standard was inapplicable. But the ultimate common law question of do you keep it safe was for the jury. They did far more than just say, oh, this standard doesn't apply because it applies to public crossings. They elicited testimony from our expert that under all law there was no legal obligation to blow the whistle at the crossing. That's far greater in the Court of Appeals than this court sanctioned. And I would also point out that it's certainly improper, even if this is the law of the case, it's certainly improper under other rulings of this court, the Court of Appeals. It's fairly form of law that an expert is not allowed to give a legal opinion, much less the other side's expert be elicited into giving an opinion that no law requires the safety actions which we were maintaining needed to be made as a matter of common law. They next say that we could or we did rehabilitate the air. And I think that is false for two reasons. First, this is the kind of air that you really can't rehabilitate. Again, if the jury hears the other side's expert say under all of the law, there's no obligation to take this safety measure, what's left for the jury to decide? In addition, in addition, I cited some case in my brief, the Talon case that says when there's when there's inadmissible evidence that goes directly to one of the legal elements of the case, that's so prejudicial that there should be a reversal. This question and these tactics went out of the one legal element of the case. They went to the whole case. They said under the law, there's no obligation to do these things. The final point they make is that we invited the air and I disagree with that as well. First of all, to be invited air, a party must actually request, proceed in one manner and then change its mind and contend it was air to proceed in that manner. We certainly didn't do that. We never, never said, oh, yeah, I agree. It's okay for you to ask our expert that line of And in fact, we objected. Also, even if there were some kind of implied invited air, we're talking about two different things. They say, well, you put on, you put on evidence of what the law does not forbid and I agree we did do that. But what the law does not forbid and what the law does not compel are two totally different topics. Of course, the law does not forbid them from taking safety measures, of course, but what the law does not compel, whether the law compels a safety measure is the very question that was going to the jury in this case. In summary, I believe that was prejudicial air and I would submit to you that that air alone demands reversal of the verdict and reversal of the trial court orders. Now I can move on to point two of the appeal and that's the trial court abused its discretion by allowing defendants experts to offer opinions of fault based on accident reconstruction. In this case, the defendants presented two experts or the defendant, Brian Pickle and Joseph Bloschke and both of these people essentially testified that Webb could have gotten away. One of them said from the stop sign he could have gotten away. Another one said that even where he came to rest on the tracks, there was time for him to get away and therefore it was his fault. Both of these defendants testified in a form of accident reconstruction. They were hypothesizing about what would have happened under different circumstances and they were testifying about things related to each party's actions and reactions and giving opinions about fault. However, the rule of law is that you can't put on accident reconstruction testimony when there's eyewitness testimony unless the testimony is outside the can or the knowledge of the average juror. In this case, we had more than eyewitness testimony. We had perfect testimony or evidence of how the accident occurred because we have a video from the train engineer's car showing how the accident occurred. And so their testimony that, oh, there was time for him to get away, that's certainly within the can of the average juror. Is that like a last clear chance argument in Missouri? Is that what they're trying to say? I don't believe that they used the words last clear chance. I'm just saying that I think that their testimony that we could have gotten away is something that's within the can of the average juror. The juror can look at that video and say, oh, okay. So until they violated the rules of Palmer and on the case that they cite Wade, which says that reconstruction testimony, again, may only be used if there's eyewitness testimony, can only be used if it's outside the can of the average juror. I would also point out that HIPLA had no human factors training and Blaschke and HIPLA didn't do any real scientific testing. They took some time and measurement calculations and they should have been excluded on that basis as well. And in response to this, what UP says is, well, they were taking time and distance calculations and that's admissible. And I agree. If they wanted to talk about time and distance calculations, they could. But to go beyond that and say he could have gotten out of the way, now we're into what I consider accident reconstruction testimony. And again, it was within the can of the average juror whether they could have gotten away. They also say that we were allowed to put on our expert testimony and therefore they should have been allowed to put on their expert testimony. But our experts actually testify to things that are outside the can of the average juror, such as AASHTO standards, the American Association of State Highway and Transportation Officials, the Railroad Grade Handbook. We talked about standards and their breach that's not within the can of the average juror. And so this isn't a case of mere image testimony. We were talking about the breaching of the standards and it causing the accident. And they're talking about, oh, he could have gotten away. So this is not a case of you know, a proposition and they get to put on not that proposition. For the final two points, I will be brief because to argue them in full, I have to cover a lot of the ground that I've already covered. The first is that the cumulant effect of the above errors warrants a new trial. In this case, the jury heard testimony elicited from our expert that the defendant was under no legal obligation to blow its train whistle. And they also heard inapplicable Missouri regulations. Mind you, Missouri has a case out there that says that statutes and regulations that apply to public property are not applicable to private property. I thought the whistle did blow, but you're saying it wasn't blowing at all? No, it was blowing just 3.8 seconds before the collision, as I read the record. Was there any testimony about what's the normal human reaction time? Yes, I think there was a testimony that it was 2.5 seconds and that came from our own expert. So it was 2.5 seconds. And I think that there was the reporter shows that there was eight seconds when the car first comes into view and that's blown in 3.8 seconds. So there's in our opinion, there's at least a two second delay. But I would also point out that a blowing it as a matter of course, when approaching the crossing, as I believe they would have under their previous rule, revoked less than 30 days before this accident. And was there a sign taken down? They can go on. Was there a sign taken down a whistle sign after they passed that, that they should blow their whistle at private crossings? Or was there never a sign there? I actually I don't know the answer. I would have to check the record. Oh, it's in there. I'll check the record. Sure. Thank you. I'll just be very brief here because my time is up. I would also submit to you that even if you ignored, even if you ignored the errors of the admission of evidence and said it was proper, the verdict is still against the manifest way of the evidence. When you look at this crossing, it's vegetation, it's sightline, it's slope, it's a lack of a whistle post, it's gravel construction, how long it took the UP engineer to blow the whistle, UP's previous effective rules. When you add up all of that, and you have a verdict in a pure comparative fault case of 100% power fault and 0% UP's, it is clearly evident that the verdict is against the manifest way of the evidence. I know that that is a, I know that that is not often the ruling of the court, but when this is a pure comparative fault case, that's very important. A pure comparative fault case and the allocation comes down 100% and zero, it's clearly evident the verdict was against the manifest way of the evidence. In conclusion, I would ask that the jury's verdict be vacated and that the trial courts of orders denying the post-trial motion be reversed and that the case be remanded for a new trial. Thank you. Thank you, counsel. And if you need a couple extra minutes, you have it too. Thank you, Your Honor. Good afternoon, and good closing report, counsel. I am Harlan Harla and I'm representing Union Pacific Railroad. I'd first like to address the questions from the bench. I think most importantly, counsel will agree that there was a mistake made in the question as to whether Guy Webb was the passenger or driver of the vehicle. Guy Webb was the driver of the vehicle. I thought that's right. Guy Webb was the driver. That's one thing. Another question was whether there ever was a sign at this location. The answer is no. This is a private crossing. It's out in the middle of nowhere. Mr. Webb bought that property and actually had to get an easement to go across it because of the owner of that land. He owns both sides of the tractor. So a very rural, private crossing. I'd like to address the law of the land. Counsel agrees that this was the prior ruling of this court, and the reason why the case was remanded the first time for a new trial. At the first trial, the plaintiffs were allowed to put in all these laws, regulations, statutes, and would try to put the law or the rule or the standard in front of the witness so he could read what it was. We were denied to do that, and those laws, regulations, standards all apply to public crossings, and that's why the case was reversed the first time. And this court said the trial court abused its discretion when it prohibited the railroad from cross-examining the plaintiff's experts and from offering its own affirmative evidence to establish that the statute, regulations, and rules are intended to address safety issues at public crossings, and they are not binding at private crossings. The railroad should have been permitted to submit evidence and argument to show that it was not required to apply the safety standards and recommendations at private crossings. Ultimately, the finer fact is charged with deciding whether the railroad met its common law duty of care under the circumstances of the case. That's the court's prior ruling, and that's all we did in the second case. Plaintiff put on evidence regarding all these laws and regulations regarding cutting vegetation and blowing whistle. He brought that up. He opened the door, not only with his experts, but with the witnesses he called, and we simply responded to that and said those standards, laws, and regulations apply to public crossings. Now let's talk about this one egregious question that you were just told about, and this is in our brief at page 18. And the question is, and as a matter of fact, you looked at the law of the federal government and you looked at the law of the state of Missouri, and as far as this train crew, there was no obligation under those laws to blow the whistle for this private crossing. Is that correct? Objection, Your Honor. And this is Judge Matosian's story. This is a subject of common law. Those rules, as he said, don't apply, and they don't provide an excuse to blow or not blow at this particular crossing. That was the objection. Judge Matosian said you can bring it up on direct. So there wasn't even an answer to the question that they just presented. There was no answer. The next, the question was, we'll break it down. First of all, you would agree that the train crew in this case lie with the federal law and there's no requirement that they sound the whistle for this particular private crossing when this accident occurred. Is that correct? Now the objection was formed foundation and relevance, not any kind of objection we're hearing here today. And Mr. Calder said I would agree that the federal regulations do not require a horn blowing for a private crossing. Under Missouri law, and there's also no Missouri law that requires the train crew to blow the whistle for this particular private crossing. I'm not aware of it. Can I redirect, rather than berate, Mr. Carlson went over and asked this witness, do these federal or state laws in Missouri have anything to do with the train crew having the duty to blow at this crossing? And he said no, they don't even apply. So this was all covered and it was brought up because Mr. Calder, the plaintiff's liability train crew expert, said that our engineer should have blown the whistle for 15 to 20 seconds prior to getting to this crossing. That's the federal law. And according to the court's prior holding, we had a right to say it didn't apply. That law did not apply to this private crossing. So this whole point here, point one of their brief, that they somehow, the railroad defendant, somehow went beyond that order, is simply not correct. When you use the term law in parts of the record, the transcript that you just cited to us, does that include common law in your mind? In the context of these questions, it assumes, this witness was asked questions about the following. So we were talking about the common law and Judge Matogian said you can cover that. The objection was this does not cover common law. Let me read it here. This is a subject of common law. This is Mr. Carlson's objection. And Judge Matogian said you can bring it up on direct. And Mr. Carlson certainly did. He said the federal law and the state law don't apply. And got this witness. He said, does this have anything to do with blowing the whistle at this crossing? It has nothing to do with that. No. Why do you say that? Well, because they have not made, there's no laws that says you can't. Again, these witnesses came in, their witnesses, and said they should blow the whistle 15 to 20 seconds. That doesn't quite answer my question. Does the question that you asked or whoever tried the case and the redirect cover specifically the question of the existence of a duty under common law or nonexistence of a duty as we ruled was was part of the paragraph that you read in the rule 23 order this court entered? I believe it does, Your Honor, based upon the objection. No, that's not what I that's not what I asked. Did the question itself cover common law? Or did it just say law? Well, you're talking about Mr Carlson's redirect talking about your year across and this redirect Mr Carlson. His objection was about the common law. And then when he did his redirect, he asked him whether there was any federal law or regulation that prohibited the railroad from sounding the whistle at this crossing. And whether there was any law that would any local law or ordinance in effect that prohibited Union Pacific from blowing the train whistle at that crossing. That's the common law. Did he use the words common law in his redirect questions? If that is your question, the answer is no. But he certainly asked about the state and the federal statutes and law and then said, Do they have anything to do with the duty that the railroad has here to blow the whistle? And this expert said, No, they don't even apply. Did anyone in the trial of this case, either in one of the questions or in arguments to the jury or instructions differentiate for the way jury the difference between statutory law, regulatory law and common law? I have to look at the jury instructions, but the jury was instructed as to the duty that the railroad had this crossing. And it was if they found a blow the whistle to maintain the crossing or to cut the vegetation, the jury instruction was based upon the common law because there was no law that applied to this private crossing. So that jury instruction was the kind of law that was the only basis that this case went to the jury on because there was no statutory requirement for doing any of these matters that are alleged the railroad was at fault. And I'd like to address the argument here. I heard counsel say railroad said all several places. We only have one reference here that we heard today. I wrote this down. The railroad said or elicit testimony. There was no legal obligation, no duty, no legal duty to do any of these matters. The railroad said no law requires safety at the crossing. The railroad said no obligation to take safety measures, no obligation to do anything under the law. That's not in this record. The only thing that we heard today and what's in that brief is this exchange that we have on page 18 and 19. That's it. There were no questions by common defense counsel. Isn't it true that to cut the grass or to prune the grain, to do, to whisk before you get to the crossing. That was not done in this case. And it's not cited anywhere in this brief for the argument today. This is the one question that's cited. Regarding the experts, what's truly interesting here is plaintiff's experts are not accident reconstructionists. They admitted they conducted no accident reconstruction, but they did. Mr Healington did do time distance speed calculations, which we have adjourned. We filed motions in limine to prevent Mr Healington and Mr Calder to give opinions that the failure to blow the whistle 15 to 20 seconds, the failure to cut the weeds, the failure to do all these things caused these accidents. That motion was denied, and these two experts gave the same type of opinions that we're hearing is error for the two or three questions regarding our experts, Mr Heckler and Mr Blanton. And those questions were Mr Heckler said if Mr Webb had stopped at the stop sign, he would have seen the train and he would have reacted and stated being based on time, distance and speed calculations that he made. That is certainly worn out. I don't know if your honors have seen the video. It shouldn't be part of the record, but the video clearly shows that Mr Webb drove by the stop sign and his front tires stopped on the nearest rail. And when that happened, the engineer, I believe one of the justices asked about reaction time. Their expert, Mr Healington, said two to five seconds. It can be. It's been noted up to three to five seconds reaction time. But even if you use the lower two and a half seconds of reaction time, if you go to the video, the first time you see the vehicle, Mr Spiker, our engineer, after he had time to see, perceive, react, blew that whistle in less than three seconds, reacted appropriately. So as far as Mr Webb again, he stops on the nearest rail. The engineer starts to blow the whistle. And what you see in the video is the truck actually goes back. It rolls away from the track. And then Mr Webb started forward. I believe the question was, did you see or do you know which way gravel spin? I believe the answer to that is going forward because you see the gravel and the dust going backwards, which only could have occurred if he's going forward. And then he stopped on the track, tragically, with the front tire between the rails and the impact occurred at that point. Now, there's, uh, the argument was made. This is a comparative fault. Because Missouri loves flying is correct. That's how the jury was instructed. And it seems that counsel is making the argument. Well, at least the railroad should have been found 1% at fault. Well, the purpose of the juror is to decide who is at fault. And here's a question that Mr Carlson asked our expert, Mr Heckler. Not to defend, but plaintiff's counsel. And I take it as I remember in your deposition, you told me as far as this accident goes, it is your belief that 100% of this fault of this accident was Mr Webb. Answer, yes. We didn't bring that up. Plaintiff's counsel did. And the jury found Mr Webb 100% at fault from this accident, for this Why would that be? What's their basis? The argument here is manifest weight of evidence that the verdict is against the manifest weight of evidence. Well, that can only be a verdict that can only be overturned if there's no evidence to support their verdict. And if you look at the video, you will see that Mr Webb drove by the stop sign, stopped down the tracks, and he had time based upon the time, distance and calculations of Mr Blaschke to react and to either have gone forward or simply backed up. Their own expert agrees that if he had simply rolled back, we heard the counsel say that this was not a flat crossing. It was a slope. You would see on the video that all he had to do was keep going back. But he didn't do it. There is plenty of evidence that supports the verdict that Mr Webb was 100% at fault. There was a comment made here about other Missouri statutes that didn't apply and that somehow that was reversible error. In the court's prior ruling, the court indicated that these other statutes that didn't apply could be brought out to show a standard of care. That was to show a standard of care for the railroad. That's why these statutes and regulations were allowed in the first case and the second case. But the court also said that they can be brought out to show a standard of care for the railroad. Well, it works both ways. What we brought out was to show a standard of care for Mr Webb. In the court's prior ruling, only this case allowed us to do it. So for all the reasons in our brief, we believe that Judge Santoni denied any discretion and that the post-trial motion and this appeal should be denied for the reasons we have in our brief. Thank you. Thank you, Counsel. Counsel. Your Honor, let me first start off by apologizing. Webb was the driver. Sometimes when you get into these appeals and you get into these legal issues, you misconstrue a fact or forget a fact. And I truly apologize for that. I wanted to address the question that Your Honor was asking about the way the record read and the objections read and the questions read with regard to use of the term law. The first question that came out says, as a matter of fact, you've looked at the law of the federal government and you've looked at the law in the state of Missouri. And as far as this train crew, there was no obligation under those laws to blow the whistle for this private crossing. Is that correct? That question uses the word law. It doesn't use regulations. It doesn't use statutes. It doesn't use countenance. It uses the word law. We objected, saying the case was a matter of countenance and we were overruled. You can bring it up on redirect. Overruled. You may answer. Then the witness says, I've kind of lost the question. And counsel said that really there was no answer to this question. But if you look further down in the transcript, he again asked about federal regulations. And that time he uses the word regulations. But after that question, he says, and there's also no Missouri law that required this train crew to blow their whistle for this So when the question was rephrased again, again, it was it was phrased as all Missouri law with no reference or distinction about common law, statutes, regulations. And this time we objected again. We said same objection. I believe that that was referring to. It's part of the compass cases of the common law case. But we also objected to form foundation relevance. Clearly that's also an objection to the form of the question asking about the law and the witness overruled again. You may answer. I'm not aware of one. That's our expert telling the jury that. Them eliciting that testimony from our expert. That is so prejudicial. And as Eric noted to me, basically this is making the jury interpret the law. When you're talking about the law generally and you hear an expert say, oh, there's no legal obligation to do that. You're having the jury kind of why this is prejudicial and it's presenting the factual question for the jury as a legal one. I want to address something else that counsel said. He said that this was just one question. He kind of made it sound like this is a needle in a haystack type thing. There's more than that. I'm going to tell you where it is in the record. But even if it were just one question, it's a very, very one needle or question. It's a very, very sharp needle. It's more like a butcher knife to have our experts saying there's no legal obligation under the law to take these safety measures. In addition, it was not limited to that one question. I would admit openly that is the most egregious example and it is by far the most prejudicial example because it's coming from the mouth of our expert. But in addition to 85 and 86 where that question is, they made comments and arguments that they had no duty to record 858 and 169. They elicited testimony regarding Missouri statutes which were inapplicable to stress their legal conclusions that there was no obligation to take the safety measures. And that's at record 178 and 439. And they also argued in closing that they complied with all Missouri rules. They used the word rules there. And again, common law is a rule of Missouri law. And that's at the record 721. So there was more than just that one question. And those other tactics increased the prejudice that we suffered. The counsel said that, you know, it was for the jury to decide if they decided that it was 100% at fault. But again, the jury's decision could not be fairly made with these kinds of evidentiary errors, with again our experts saying there's no legal obligation to take that step. And again, as to the question about the rolling at the stop sign, he would have just, if he had just rolled backwards or forwards, I would point out that the gravel is spinning because the tires are spinning because of the gravel. And he's not able to go forward because of the slope. Those are the things that we maintain should have been changed at this crossing. Was there any evidence of the gravel going the other way? It was always going the same way. I kind of, someplace I read, it looked like it was going one way and it was going another way. Was it backed up? I would have to look at the video again to know for sure on this. I thought it was in the brief. Maybe I'm wrong. In any event, the final point that I want to make is, they said the standard for against the manifest weight of the evidence is no evidence. No, go ahead. The standard for against the manifest weight of the evidence is no evidence. I don't believe that's a fair statement of the law. I think it's no evidence or clearly evident that the verdict was wrong. And this verdict is clearly and evidently wrong because it allocates 100% of the fault to my client and 0% to UP, given the danger of this crossing. Again, I would ask that the jury be vacated and the trial court's post-trial orders be reversed and the case be suspended for a new trial. Thank you. Thank you, Counsel. Appreciate the briefs and arguments of counsel. The court will be in a short recess and then have the last argument of today.